NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

INTERNATIONAL WOODWORKERS
OF AMERICA, LOCAL UNION NO.
13-433, AFL-CIO, Respondent.

No. 16089.

United States Court of Appeals
Ninth Circuit.

March 2, 1959.

Jerome D. Fenton, Gen. Counsel,
Thomas J. McDermott, Associate Gen.
Counsel, Marcel Mallet-Prevost, Asst.
Gen. Counsel, Frederick U. Reel, Marga-
ret M. Farmer, Attys., N.L.R.B., Wash-

ington, D. C., Louis Penfield, Atty., N.L. R.B., San Francisco, Cal., for petitioner.

Halpin, Halpin & Leep, Redding, Cal., for respondent.

Before STEPHENS and ORR, Circuit Judges, and ROSS, District Judge.

ROSS, District Judge.

This case is before the Court upon the petition of the National Labor Relations Board, pursuant to Section 10(e) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 160(e), for the enforcement of the Board's Order issued February 20, 1957, against International Woodworkers of America, Local Union No. 13–433. This is the second time this case has been before the Court. On the first occasion (9 Cir., 238 F.2d 378), when the case was considered for summary entry of decree, the matter was remanded and the Board was directed to make a determination of the matter on the record. On remand the Board made new findings on the so-called "alternative" issues referred to by this Court in its opinion in N.L.R.B. v. Technicolor Motion Pictures Corp., 9 Cir., 248 F.2d 348. A portion of the Board's "Supplemental Decision" entered by it on February 24, 1958, after it had considered the record as directed by the remand order is as follows:

"We have carefully reexamined and reconsidered the entire record in this case in the light of the Technicolor court decision (decided September 24, 1957, and in which case this Court referred to "alternative" issues) and with all due respect to that Court, we adhere to our original decison and our interpretation of the Act. Moreover, even assuming that Hatfield's tender was belated, we nevertheless find that the Respondents accepted Hatfield's tender and thereby waived his asserted delinquency as a ground for discharge."

Briefly stated the facts show that Ralph L. Smith Lumber Company was engaged in a logging operation near Anderson, California. The camp was unionized under a collective bargaining contract between the Union and the Lumber Company, the employer, which contract had been entered into October 4, 1950. The contract required union membership as a condition of employment, Article II of the contract reading:

"Article II. Within 30 days from the effective date of this clause or within 30 days after employment, every employee represented by the union, as a condition of employment, shall become and remain a member of the union. * * * "

Hatfield, the employee with whom we are concerned, and two others, Thomas and Spangle, were working for the Company at the time of its fall shut-down. None of the three had union membership. When the logging operations were resumed about the middle of March, 1955, these three men resumed their former employment. On May 5, some six weeks after the spring reopening, Dickey, a union steward, asked Thomas, Spangle and Hatfield for their membership applications. Thomas and Spangle signed up then and there, but Hatfield stated that he was under the impression he had made an application the previous fall. No such application on the part of Hatfield was found, and the next day, May 6, a demand was made on the Company for the discharge of Hatfield. Following this first demand for discharge the events hereinafter related took place, culminating in the acceptance of Hatfield's application for membership by the regular job steward, Gordon, who until then had been hospitalized and off the job. Later the application was returned to Hatfield by the Union with the statement that the procedure was illegal and unacceptable to the Union, and for the second time a demand was made on the Company for Hatfield's discharge. The request was complied with.

The issue is whether under these circumstances the Board properly found that the acceptance of the tender of Hatfield's application for membership, and the acceptance by the Union steward under such circumstances, constituted a

waiver by the Union of its right thereafter to demand Hatfield's discharge under its union-security agreement.

In view of our holding that in this type of case much weight must be accorded the factual background, we set out the pertinent facts in chronological order.

March 15, on or about, the Company resumed its logging operations which had been closed down the previous fall. Hatfield and his two companions, Thomas and Spangle, were re-employed.

May 5, Dickey, a Union steward, requested Hatfield, Thomas and Spangle to sign union membership cards. Thomas and Spangle complied. Hatfield did not, stating that he believed that he had signed such a card the previous fall. An immediate search of the Union records failed to disclose any such previous application on the part of Hatfield.

May 6, 1955, one Crimmins, a union official wrote the Company requesting Hatfield's discharge for not having joined the Union. Hatfield had not been advised of the fact that no membership card had been found. On being informed by a Company officer that the Union had requested his discharge Hatfield stated that he was willing to join the Union. As a part of this conversation he, Hatfield, was advised that he should see Dickey, a Union Steward, for the purpose of making his application for membership, it being pointed out that the regular stewart, Gordon, was ill. Hatfield stated that it was difficult for him to get from the woods to camp to see Dickey but that he would make every effort to do so, contact Dickey there, and sign up.

*May 10.* Hatfield went into camp after work but Dickey was out fishing so there was no contact, but on Dickey's return one Watson, recording secretary of the local, advised him that Hatfield had been looking for him in order to sign up.

*May 11.* Before going to work Hatfield met one Johnston in the Company store, and asked Johnston to sign him up. Johnston stated he was not authorized, and for him to see Dickey.

*May 11.* After work Hatfield went to Dickey's house for the purpose of signing up but Dickey was not at home.

*May 11.* At an evening monthly meeting of the local, Crimmins, the Union official who had on May 6 written the Company requesting Hatfield's discharge, asked for and received ratification for his act from local union members. At the meeting which resulted in ratification of Crimmins' act demanding discharge of Hatfield the union members present were not advised of Hatfield's effort to sign up.

*May 12.* Before the bus started to the woods with the men in the morning Hansen, a Company employee, told Dickey, who was on the bus, that he would like to get the Hatfield "mess" straightened out. Dickey replied that the matter was out of his hands. About this time Hatfield saw Dickey on the bus, went over, and asked for a membership application to sign. Before Hatfield could reply the bus pulled out for the woods. Hatfield then went to the Company store, signed a statement to the effect "I have offered to join the Union as soon as the papers are offered to me to sign I will do so." (R. 233) He gave this note to Hansen, a Company employee, who in turn delivered it to the Company's logging superintendent. During the day Hatfield saw Dickey in the woods and asked him for the necessary papers for him to sign. Dickey's answer was that at a meeting the previous night Crimmins' action demanding Hatfield's discharge had been ratified, and the matter was now beyond his control.

*May 12.* In the morning Gordon, the steward who would ordinarily have handled the application matter, returned after an absence caused by illness. He was advised of the Hatfield situation. Gordon then said that under the circumstances he would sign Hatfield into the Union. Hatfield, later in the same day, signed a letter addressed to the Company for the attention of Hansen. The letter advised that there was enclosed Hatfield's authorization for deduction of Union dues and initiation fees duly signed as

"nunc pro tunc" to November 1, 1954. It further advised Hansen, the Company man, that he was authorized to make the "check-off." A short time later on the same day Gordon, the steward, entered the Company store and was given Hatfield's letter. He then went into the woods, found Hatfield, and the necessary papers were signed, including the application for membership and the "check-off" card. Gordon signed these documents as "Job Steward, International Woodworkers of America, Local 13–433." Later, at Hatfield's request, a new check-off slip was signed and the former one, which made the check-off effective back to November of 1954, was destroyed. It was then delivered to the Company via Johnston.

*May 14.* Gordon, the steward, advised Crimmins, a Union official, that he had signed up Hatfield, and attempted to deliver to him Hatfield's application for union membership and copy of check-off slip. Crimmins did not question Gordon's authority to sign up Hatfield but stated that he "wished" that he, Gordon, had not signed up Hatfield because he, Crimmins, had written the Company demanding Hatfield's dismissal. He told Gordon to keep the documents "for awhile."

*May 16.* Crimmins wrote the Company again, stating that he had received the so-called "nunc pro tunc" letter written by Hatfield on the 13th of May, that the procedure was illegal and unacceptable to the Union, and that he again demanded the discharge of Hatfield under the "discharge" clause of the contract between the Union and the Company.

*May 17.* The Company complied with the discharge request of May 16.

*May 20.* The Company at Hatfield's request sent the Union a check for $23.50 for initiation fees, plus dues for the month of May. The check was returned by the Union, with the statement that Hatfield was not a Union member and was not eligible for membership.

*July 14.* Hatfield was reinstated by the Company.

*July 21.* Hatfield's attorney sent the Union a check for $30.50 to cover Hatfield's initiation fees, plus dues for April, May and June. The check was returned with the advice that Hatfield was not eligible for membership. The Company later discharged Hatfield for cause.

In its brief the Union states "most of the facts are undisputed. Respondent has read the Board's statement of the facts contained in its brief. There is no serious disagreement with this statement * * *". At this point we quote from N.L.R.B. v. Aluminum Workers, 7 Cir., 230 F.2d 515, 517. "The facts are not largely in dispute; the controversy is as to the legal consequences which spring from them."

Since there has been much discussion, both in the briefs and during oral argument, of the Technicolor case, N.L.R.B. v. Technicolor Motion Pictures Corp., 9 Cir., 248 F.2d 348, decided by this Court September 24, 1957, we turn directly to that case to take our bearings. The facts there were as follows: A similar union-security provision was contained in the contract between the Union and Technicolor, the employer. One Balthrope, an employee of the Company, did not apply for membership in the Union or tender his initiation fees during the thirty day period though he knew of the union-security provisions of the contract. The contract had been executed on July 31, at which time Balthrope was in Company employ. On August 31, 1954, the Union made a written demand on the Company for the discharge of Balthrope. No action was taken by the Company on the demand. Repeated demands were made by the Union for Balthrope's discharge during a period extending into January of the next year. All demands went unheeded. "Meanwhile, on December 7, 1954, after steadfastly refusing to do so for four months, Balthrope applied for Union membership" and tendered his initiation fee. 248 F.2d at page 350.

On February 1, 1955, the Company discharged Balthrope, whereupon he lodged his complaint before the Board alleging that the Union by causing the

Company to discharge him after he had paid his initiation fee violated Sections 8(b) (1) (A) and 8(b) (2), and that the Company by yielding to the Union's demand violated Section 8(a) (1) and 8(a) (3) of the National Labor Relations Act, 29 U.S.C.A. § 158(a) (1, 3), (b) (1) (A), (2). The Board found for the employee Balthrope and against the Union and Technicolor.

In its review of the Board's ruling in the Technicolor case this Court observed that the Board in reaching its decision in that case had relied upon the "broad doctrine" promulgated by Aluminum Workers case, N.L.R.B. v. Aluminum Workers International Union, a Seventh Circuit case reported in 230 F.2d 515. This Court then, 248 F.2d at page 350, cited the following from the Aluminum case, which involved "an employee purportedly delinquent in the payment of her periodic union dues * * * :

'* * * a full and unqualified tender made any time prior to actual discharge, and without regard as to when the request for discharge was made, is a proper tender and a subsequent discharge based upon the request is unlawful.' "

Adverting then to the discussion of the situation in the Technicolor case this Court said:

"Our initial concern is, of course, with the germane provisions of the Act and, for purposes of clarity, we deem it desirable to set forth those subsections at the outset of our discussion. The first proviso to § 8(a) (3), which sanctions union security agreements, has been noted already. § 8(a) (1) (relating to the employer) and § 8(b) (1) (A) (relating to the union) make it an unfair labor practice 'to interfere with, restrain, or coerce employees in the exercise of rights guaranteed in section 7 [29 U.S.C.A. § 157];' which include 'the right to refrain' from union activities 'except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition

of employment as authorized in section 8(a) (3).' Further, § 8(a) (3), made applicable to unions by § 8(b) (2), prohibits an employer from 'discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization' except as provided in the succeeding proviso authorizing union security agreements. Even under such a union security agreement any discrimination based on non-membership is strictly limited. An employee need only tender his initiation fee and periodic dues to avoid discriminatory action including, of course, discharge. This is made clear by the second proviso to § 8(a) (3) that under a union security agreement an employer cannot justify discrimination against an employee for non-membership in the union if he has reasonable grounds for believing that such membership 'was not available to the employee on the same terms and conditions generally applicable to other members, or * * * was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership.' Likewise, a union is forbidden by Section 8(b) (2), 'To cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership.'

"We understand the Board's position to be that the above statutory provisions embody Congressional recognition of the problem of so-called 'free riders;' (i. e., those em-

ployees who enjoy the benefits of union representation under union agreements without contributing to the financial support of the union by paying initiation fees and periodic dues), and authorization to deal with this problem by permitting unions operating under such agreements to cause the discharge of those employees who are 'free riders;' that Balthrope was such a 'free rider' after the expiration of the thirty day grace period; that under the Act and the collective bargaining agreement the power was vested in the Union to cause, and the Company to effect, a lawful discharge of Balthrope so long as the initiation fee remained due and untendered; that upon tender of his initiation fee Balthrope ceased to be a 'free rider,' and concomitantly the power to discharge him was lost; that any subsequent demand by the Union for his discharge was necessarily for a reason other than the failure to pay the initiation fee, and similarly, his discharge was for a reason other than the failure to pay the initiation fee; and hence both the Union and the Company were guilty of the unfair labor practices as charged.

"Respondents assert that the Act allows execution of a collective bargaining agreement requiring an employee subject to a union security contract to join the union or at least tender his initiation fee within the thirty day grace period; that this statutory authorization enables a union to insist upon the timely submission of uniformly required initiation fees; and that an employee who fails to tender his fee within the required period cannot by a tardy attempt to meet his contractual obligation forestall his discharge for failure to comply with the terms of the agreement." 248 F.2d at pages 350–353.

We cite further from our opinion in the Technicolor case as follows:

"If the employee pays his fees and dues he is protected from discharge. The critical question, and the one which causes a divergence of viewpoint, is whether the union security agreement proviso which empowers unions and employers to make agreements by the terms of which employees are required to join the union within the thirty day grace period (and an agreement executed thereunder) means that the employees must join the union during this period in order to avert possible discriminatory treatment or whether it is enough that they join at any time prior to actual discharge. Neither the literal language of the Act itself nor its legislative history furnishes an explicit answer to this precise issue." 248 F.2d at page 352.

This Court then went on to say that time was of the essence of the thirty day so-called period of grace, and that "on its face the proviso permits agreements which 'require' employees to initiate union membership within a specified time," and concluded "we believe (this indicates), a Congressional intent to permit discrimination based on the failure to tender uniformly required initiation fees where the employee has not fulfilled his obligation within the period expressly granted for his protection." 248 F.2d at page 353.

There then follows a discussion of the Taft-Hartley Act 29 U.S.C.A. § 141 et seq. We further stated:

"Although the legislative materials contain no explicit reference to the effect of late tender of initiation fees on the power to cause discharge or to discharge an employee who breached his obligation to tender the fees within the specified time limitation authorized by the statute and provided for in the contract, the implication is strong from the great importance attached to the grace period that timely tender is required to prevent a lawful discharge of the

employee in the absence of circumstances which forestall the union or employer from relying on the employee's failure to pay the fees." 248 F.2d at page 353.

Continuing, we said that the Board adopted this construction of the Act in the beginning and consistently followed it until the Aluminum Workers case, decided by the Seventh Circuit, March 2, 1956, caused it to leave the path of rectitude and follow the doctrine enunciated therein, which doctrine the Second Circuit Court of Appeals in the International Ass'n of Machinists, A.F.L.-C.I.O. v. N.L.R.B., 247 F.2d 414, 418, said was "an incorrect statement of the law." The Machinists case held that a union could lawfully compel the discharge of a delinquent member under a union security agreement despite a belated tender of dues. It is to be observed that the Aluminum case and the Machinists case both deal with failure to pay dues. In this Hatfield case we are concerned with application for membership.

So far as the fate of this, the Hatfield case is concerned, the most important discussion made by this Court in the Technicolor case revolves around the so-called "alternative ground" to support the Board's ruling. See page 355 of that reported opinion. In that connection we pointed out that an oral argument there was the contention that the conduct on the part of both the Union and the Company precludes them from asserting their respective rights under the collective bargaining agreement. Our comment on this discussion was:

"Careful attention and consideration has been given this argument. It is not without appeal or merit. But the conclusion seems inescapable that it cannot be supported on the record now before us. * * * For * * * the General Counsel raised no issue concerning waiver, acquiescence or similar conduct on the part of either Respondent. Thus the preclusion argument addressed to this Court was not raised, argued or decided in the proceedings to date." 248 F.2d at page 355.

We concluded that "an employee must not remain perpetually vulnerable to discharge because of tardiness in submitting initiation fees, irrespective of the conduct engaged in by the union or the employer."

"Either the employer or the union may by its actions be estopped from asserting its particular rights under the collective bargaining agreement. But inherent in making such a determination is the balancing and accommodation of different interests and various factors based on policy considerations." 248 F.2d at page 356.

It being apparent that the Board had not considered the "alternative ground" at its hearing, and consequently could not have then predicated its ruling thereon, we said:

"We believe that under the circumstances here existing this issue (alternative grounds) should be considered in the first instance by the Board," (248 F.2d at page 356)

and not by this Court for the first time on appeal. The Technicolor case was then disposed of by remanding it to the Board for such further proceedings as it might deem justified in the light of the views we had expressed in the opinion. Previously we had remanded this instant case back to the Board which Board, at the time of entering its Supplemental Decision of February 24, 1958, had before it the views we had expressed in the Technicolor opinion. Our remand of this Hatfield case on its first appearance before us was on August 6, 1956. Our remand in the Technicolor case was on September 24, 1957. There the Board had before it our discussion of the Technicolor case when it entered its supplemental decision, wherein it said:

"We have carefully reexamined and reconsidered the entire record in this case in the light of the Technicolor court decision, and with all

due respect to that Court, we adhere to our original decision and our interpretation of the Act. Moreover, even assuming that Hatfield's tender was belated, we nevertheless find that the Respondent accepted Hatfield's tender and thereby waived his asserted delinquency as a ground for discharge."

■ We are convinced on the facts of this case that the findings of the Board in its supplemental decision are supported by the record, and that, irrespective of its deferential disagreement with this Court on the interpretation of the Act, the finding of the Board to the effect that the respondent accepted Hatfield's tender and thereby waived his asserted delinquency as a ground for discharge, is a sufficient finding supported by the facts.

■ There has been some discussion as to whether the doctrines of (1) waiver and/or (2) estoppel applied here. It seems academic to enter into that discussion now, since the application of either would sustain the Board's position, namely, that the discharge of Hatfield under the circumstances as appearing in the record, was unlawful. We would support this conclusion by way of waiver rather than estoppel. The latter is an equitable rather than a legal defense. Volume 15, Words and Phrases, Estoppel, page 607.

We think, however, that this case can be decided on the principles of agency. As we see it, there is nothing in the record limiting the power of stewards to accept applications for membership. That was their job. If an employee was subject to discharge for non-membership, then it is a corollary of that fact that there always be available to him on the job, persons authorized to accept his application. There being no limitation of authority then every steward acted within the scope of both his real and apparent authority when he accepted an application for membership. His was but a ministerial duty.

■ Nowhere in the record is there any intimation that in the acceptance of applications a steward had any discretionary or quasi-judicial functions. He could not pass upon the merits of the application—his sole duty was to make himself available to the workers to the end that applications could be made to him. Thereafter his only authority was to process the application; that is, to forward the application and money on to the proper Union officials. Such being the situation, we are of the opinion that the Union was bound by the acts of its agents, and that when Hatfield's application was made to and accepted by Gordon, he, Hatfield, had done all that was required of him at that point. And Gordon, in accepting the application in the course of his employment, and under the specific authority vested in him as a steward, acted legally in accepting it, and thereby bound the Union. At this point the matter was closed, and the discharge provision could no longer be invoked. On this reasoning there is no need of calling the doctrines of waiver and/or estoppel into play.

But assuming for the purpose of argument that there was some nebulous restriction that might have been asserted by the steward, Gordon, which he might have stood upon in refusing Hatfield's application, the fact is that he did not do so. This, then, would amount to a waiver.

On the alternative ground of "waiver" alluded to by us in the Technicolor case, we there said "careful consideration has been given to this argument. It is not without merit." In the Technicolor case we said "But the conclusion seems inescapable that it (waiver) cannot be supported on the record now before us." 248 F.2d at page 355. Here, in the Hatfield case, we are satisfied that the finding of waiver by the Board is supported by the record.

It is conceded that the Union could have lawfully requested the discharge of Hatfield and his two companions within the thirty-day period. However, it did not do that. Thomas and Spangle were permitted to make applications which were accepted approximately two months

after the spring reopening. It is obvious that the thirty-day rule was not always followed, and it appears that here at least the Union exercised the personal right of waiver. Hatfield, instead of instantly signing the application for Union membership along with Thomas and Spangle, raised the question of his former application. So far as we know the point was honestly raised, though a search of the Union records revealed that no such application had been made. This being ascertained by the Union, demand was made for Hatfield's discharge the very next day. Why, after waiving as to Thomas and Spangle, was the Union so "hell-bent" as to stand on ceremony with Hatfield? Under the standard of fair treatment, which both the Wagner and the Taft-Hartley Acts invoke, the least that the Union officials could have done would have been to advise Hatfield that no former application had been found, and give him an opportunity then to make, or refuse to make, an application for membership.

We are not particularly impressed with the various arguments presented by Respondent's brief. It concedes that "most of the facts are undisputed," and states that it has no serious disagreement with the Board's statement of facts. The first argument advanced is that respondent should have had an opportunity to offer further testimony going to the alternative theory of waiver. The motion to reopen was denied by the Board. Without going into detailed discussion, we are of the opinion that a reopening of the case before the Board would have added nothing substantial to respondent's case. We are satisfied that all of the material facts were presented to the Board at the original hearing. We adopt the language used in the Board's reply brief. "The facts which respondent seeks to adduce (on its motion to reopen) would be completely irrelevant to the issues of the case." We hold that the Board properly denied respondent's motion to reopen.

Respondent presents its views on the theories of estoppel and waiver. We agree that this was not a situation where estoppel would lie. We have said that in our opinion it was not necessary to invoke "waiver" to sustain the Board's order, but if such had been required we are convinced that, regardless of how the Respondent spells out the elements of waiver and points out that waiver could not come into play by reason of the absence of certain of the so-called necessary elements, the acts and conduct of the Union agents, especially the acceptance by Gordon of the Hatfield application for membership, together with his money for initiation fee, and the check-off card, did amount to a waiver of any "special" instructions or authority that might have permitted him to act to the contrary.

## II.

Respondent discusses the Technicolor case, at some length. We do not think the holding of this Court in that case precludes the Court from holding to the contrary on the facts here presented, nor does our opinion herein expressed amount to an overruling by this Court of its ruling entered therein. The two cases are clearly distinguishable on their facts. In this particular type of case much importance must necessarily be attached to the factual background. This Court does not depart from its ruling in the Technicolor case upon the facts therein found, nor does it disagree with what the Seventh Circuit said in the International Ass'n of Machinists case. We do hold, however, that the rulings laid down in those two cases do not fit every fact situation, and surely they do not fit the fact situation presented here. We reiterate that the facts dictate the law to be applied. These cases must be recognized for what they are—they are concerned not only with the right to secure union membership, but also with the right of men to work, which means to eat, and so to sustain life. Therefore, there can be no dogmatic application of any one set of rules. Rather there are certain generally recognized principles, referred to in the cited cases, which are to

**658**

be tempered to fit the need of the particular factual background of each case.

We do not believe that the spirit or the letter of the Wagner and Taft-Hartley Acts, under whose provisions this type of collective bargaining contract, with its thirty-day provision as to union membership, is allowed, was intended to justify a Union to permit the thirty-day period to go long past, and having accepted the membership of certain employees, refuse to accept, or reject, the application of other employees similarly situated. To permit such a practice would, in our opinion, sanction the very thing the provisions of these Acts seek to avoid, and would allow to be done through the back door what could not be done through the front.

The right to enjoy the blessings of life, liberty and the pursuit of happiness is founded on the right to work. Deprived of that right, man becomes a groveling animal. This being true, it follows that every statute, decision, contract, rule or decree impinging upon that right should be carefully scrutinized and as carefully construed. Even without the warning provisions of the Wagner Act and Sections 8(a) (3) and 8(b) (2) of the Taft-Hartley Act, we should be inclined to interpret the "non-membership" provisions of this type of union-employer contract in such a manner as to eliminate, so far as possible, the inherent harshness of such a provision. However, we need not base our approach to this problem on any court-conceived philosophy of human kindness, for Congress recognized the danger inherent in any agreement whereby a man can be deprived of his right to work under color of law. Its views are explicit in the provisions of the Wagner and Taft-Hartley Acts.

For the reasons hereinabove given, we are of the opinion that the order of the Board entered on February 20, 1957, as supplemented by its decision of February 24, 1958, should be, and it is hereby ordered enforced.