NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

PACIFIC TRANSPORT LINES, INC.,
and Marine Cooks and Stewards,
AFL–CIO, Respondents.

No. 16636.

United States Court of Appeals
Ninth Circuit.

April 3, 1961.

Rehearing Denied May 19, 1961.

Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, for N.L.R.B., Duane B. Beeson and Herman I. Branse, Attys. for N.L.R.B., Washington, D. C., for petitioner.

John Paul Jennings, of Roos, Jennings & Haid and Richard Ernst, San Francisco, Cal., for respondents.

Before HAMLEY, MERRILL and KOELSCH, Circuit Judges.

KOELSCH, Circuit Judge.

The National Labor Relations Board has adjudged both Pacific Transport Lines, Inc. and the Marine Cooks and Stewards, AFL-CIO, guilty of unlawful discrimination against an employee, Ernest Brown, in violation of the National

Labor Relations Act, as amended. 61 Stat. 136; 73 Stat. 525, 541; 29 U.S.C.A. § 151 et seq.[1] Its Decision and Order are reported in 119 N.L.R.B. 1505. By this petition the Board seeks enforcement of its order against each party. We have jurisdiction under Section 10(e) of the Act (29 U.S.C.A. § 160(e)).

The essential facts relied upon by the Board in its Decision and Order reveal that in November, 1955 Brown sought to register at the Union's hiring hall in San Francisco in order to obtain a job assignment; the Union had been certified as the collective bargaining representative, after a Board-conducted election, of the employees working for members of the Pacific Maritime Association, including the respondent-employer, and had negotiated a collective bargaining contract in June, 1955 calling for a "union shop" which required all present employees to become members of the union by July 24, 1955;[2] but since Brown had not as yet joined the Union, he was referred to a "Shanghai Abe" Handelsman, a patrolman in charge of collecting dues for the union. Shanghai Abe, on the information Brown gave him, computed the amount then owing to be $80.00, consisting of $60.00 dues for the last three quarters of 1955 and $20.00 for a permit fee. Brown had only $20.00 with him, but Shanghai Abe agreed to accept this sum and to permit Brown to pay the remainder after the completion of his next trip.

Brown was assigned to a job on the Employer's ship, the S. S. Philippine Transport, on February 11, 1956 and made several trips but did not thereafter communicate with or make any payment to the union. Finally on his return on April 18, 1956 to San Francisco from one of these trips he was met by Shanghai Abe, who requested payment of the back dues. Brown then asked for a further extension of time until the ship had made the "loop"[3] to Los Angeles and back; Shanghai Abe again consented.

However, two days later on April 20, 1956 Shanghai Abe boarded the Philippine Transport and demanded payment saying, "I talked it over with the president [of the union]. You are supposed to pay before the ship leaves the port or get off." Although Brown then had $60.00 in cash on his person he made no tender to Shanghai Abe, but again requested additional time ostensibly to permit him to call his mother and have her wire the money to him. This request was summarily rejected; Shanghai Abe took Brown to the purser of the ship to have him paid off.

Brown attempted to borrow the dues money from the purser, but Shanghai Abe flatly told him that "you had to get off and that is it." Later, while the two

---

1. Section 8 (a) (3) of the Act makes it an unfair labor practice for an employer to discriminate " * * * in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *."

    Section 8 (b) (2) makes it an unfair labor practice for a union " * * * to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership."

    Because the Board found the Union and Employer guilty of discrimination, it also found, derivatively, that they had restrained and coerced Brown in the exercise of his rights under Section 7 of the Act in violation of Sections 8 (a) (1) and 8 (b) (1) (A).

2. Under the 1947 Taft-Hartley Amendment to the National Labor Relations Act, the "union shop" is expressly authorized; a *proviso* to Section 8 (a) (3) states:

    "That nothing in this subchapter * * * shall preclude an employer from making an agreement with a labor organization * * * to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later * * *."

3. The "loop" refers to the voyage from San Francisco to Los Angeles and back.

were in the officer's mess obtaining some papers for the purser, a fellow-seaman offered to pay whatever amount Brown owed. Shanghai Abe refused this offer with the explanation that only when Brown came down to the hiring hall and paid his dues, would he again be eligible for employment but on another ship.

The Chief Steward, Domingo C. Rosa, was present when Brown was first ordered off the ship; he was asked by Shanghai Abe to fire Brown, but declined, saying he saw no basis for discharge. Before leaving the ship, Brown requested and received a letter from Rosa explaining that he was being taken off the ship by the Union.

On May 2, 1956 the Union sent a formal letter to the employer, as required by the collective bargaining agreement, requesting that Brown be discharged for failure to. pay dues. On May 4, 1956 Brown went to the Union and paid the $60.00 arrearages in dues; he has subsequently received assignment on a ship with another employer.

The Trial Examiner found that the Union caused the Employer, through Chief Steward Rosa, to terminate Brown's employment on April 20, 1956, but declined to hold that the termination itself was discriminatory or otherwise violative of the Act. In reaching this conclusion the Trial Examiner credited Brown's testimony but stressed the fact that Brown's long continued and unjustifiable failure to meet his obligation to join the Union and pay his dues clearly had given the Union the right to cause his discharge. The Trial Examiner not only thought that Brown had received "exceptional consideration" up to April 20, but concluded that Brown was "actively evading the payment of dues" and thus was not prejudiced by Shanghai Abe's abrupt revocation of the "extension of time" previously granted on April 18th. In addition, Brown's course of conduct including his request to call his mother to obtain money when he had $60.00 on his person convinced the Trial Examiner that Brown was a "free rider" not entitled to benefit from the Union's "past indulgences."

The Board rejected this view and found an unlawful discharge solely upon its resolution of the following issues:

"The significant issue in connection with the Union's ultimate responsibility for Brown's discharge is not, as the examiner appeared to think, whether the extension of time given Brown * * * was revocable. For even if the extension is deemed revocable, the issue remains as to whether Brown * * * actually received a reasonable time after revocation within which to tender his dues."

The Board concluded that the time was not reasonable:

" * * * it would be inequitable to treat Brown as delinquent on April 20, and subject to discharge, immediately after he was notified that his extension of time to pay his dues had been rescinded."

Accordingly, both the Union and Employer were held responsible for an unlawful discharge.

The essential question presented by this petition is focused on the equities between the Union and employee, as shaped and influenced by the legislative policy inhering in the union security provision of the Taft-Hartley Act.

That policy has strongly recognized the Union's right to discipline employees for non-payment of dues under a union security clause, while at the same time proscribing all other forms of discrimination by them designed to encourage union membership:

" * * * Congress recognized the validity of the unions' concern about 'free riders', i. e., employees who receive the benefits of union representation but are unwilling to contribute their share of financial support to such union, and gave unions the power to contract to meet that problem while withholding from unions the power to cause the discharge of employees for any other reason."

Radio Officers' Union of Commercial Telegraphers Union A. F. L. v. N. L. R. B., 1954, 347 U.S. 17, 41, 74 S.Ct. 323, 98 L.

Ed. 455; see also, H.R. 245, 80th Cong., 1st Sess., pp. 9, 34; S. 1126, 80th Cong., 1st Sess.

That policy has also made it abundantly clear that where a union security clause is in force, the duty and obligation to join the union within the prescribed time is imposed by Section 8(a) (3) of the Act on the employee; this court has so construed that Section in light of its legislative history:

"On its face the proviso permits agreements which 'require' employees to initiate union membership within a specified time. The payment of initiation fees is the first step in acquiring union membership. The imperative character of the phrase 'to require' followed by a definite time period for compliance during which period discrimination based on nonmembership is expressly proscribed, indicates, we believe, a Congressional intent to permit discrimination based on the failure to tender uniformly required initiation fees where the employee has not fulfilled his obligation within the period expressly granted for his protection."

N. L. R. B. v. Technicolor Motion Pic. Corp., 9 Cir., 1957, 248 F.2d 348, 352, and legislative history cited therein.

■ Thus, while the power of a union to discriminate has been effectively circumscribed in favor of an employee's right to engage in or refrain from various forms of union activity, and thus insulate his job from union membership, the power of the union to effect a discharge for non-payment of dues or initiation fees under a union security agreement has been left free and unfettered. We have duly recognized the important policy behind this right of the union in N. L. R. B. v. Technicolor Motion Pic. Corp., supra, where we said:

" * * * it perverts the legislative mandate to enlarge the scope of protection afforded employees. To do so would not only frustrate the manifested intention of Congress but also

would tend to stimulate industrial instability. The effective enforcement of union security provisions of collective bargaining agreements depends in large measure upon the authority and capacity of unions to invoke the sanction of loss of employment against those non-union employees who fail to join the union or tender their initiation fees. If those employees were to be permitted to disregard with impunity the thirty day time limitation and refrain from tendering their fees until just prior to discharge, the persuasive force of the statutory sanction granted unions would be drastically diluted." [248 F.2d at page 354]

■ These broad policy considerations, however, cannot be divorced from the equities of a particular case, for it is apparent that a union may not effect a discharge or other form of discrimination under the guise of non-payment of dues or initiation fees when in fact the real basis for such action is otherwise and therefore proscribed. See, N. L. R. B. v. Acme Mattress Co., 7 Cir., 1951, 192 F.2d 524; N. L. R. B. v. Eclipse Lumber Co., 9 Cir., 1952, 199 F.2d 684; Annotation, 36 A.L.R.2d 630.

■ We are therefore armed in our approach to the instant case by a delicate scale which must weigh these equities and inherent legislative policies on both sides:

"Either the employer or the union may by its actions be estopped from asserting its particular rights under the collective bargaining agreement. But inherent in making such a determination is the balancing and accommodation of different interests and various factors based on policy considerations. The questions presented are thereby manifold."

N. L. R. B. v. Technicolor Motion Pic. Corp., supra, 248 F.2d at page 356; see also, N. L. R. B. v. International Woodworkers of America, 9 Cir., 1959, 264 F. 2d 649.

■ We have reviewed the record before us and considered the evidence as a whole. It is our judgment that the

Board's decision is not supported by "substantial evidence" and cannot stand. We think that the Trial Examiner properly considered and weighed all of the evidence while the Board confined its consideration to only a part, limiting itself to the isolated "extension" given by Shanghai Abe on April 18th.[4] Our review of the record requires more than a glance at evidence which would support the Board's theory; the Supreme Court has defined our function clearly:

> "Whether or not it was ever permissible for courts to determine the substantiality of evidence supporting a Labor Board decision merely on the basis of evidence which in and of itself justified it, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn, the new legislation [Section 10(e) of the Taft-Hartley Act] definitely precludes such a theory of review and bars its practice. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."

Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 487, 71 S.Ct. 456, 464, 95 L.Ed. 456; Morrison-Knudsen Co. v. N. L. R. B., 9 Cir., 1960, 276 F.2d 63.

The evidence before us establishes that Brown was required to join the Union by July 24, 1955, that he made no attempt at all to do so until November, 1955, and that on April 18, 1956, the Union had an unqualified right to demand Brown's discharge for non-payment of dues. But this same evidence shows much more:

It shows that Brown had been employed by various steamship companies for approximately twelve years and was working on the S. S. Mormacrey at the time the instant collective bargaining agreement became operative; it shows that Brown made frequent trips aboard the Mormacrey in August, 1955 to San Francisco, Los Angeles, Portland and Seattle, yet made no effort to either contact the union offices in those cities to inquire about or obtain the requisite union membership, nor to pay his dues for the period;[5] it shows that only after his termination on the Mormacrey in New York (October 24, 1955) and when he later sought a new assignment in San Francisco (November, 1955) did he make any personal effort to become a member of the Union; it shows that after he had filed his application with Shanghai Abe, he immediately obtained an extension of time to pay the $60.00 back dues, until "after the first trip," but although he worked aboard the Philippine Transport on the "loop", then travelled to Japan and back, he never made any attempt to pay his arrearages.

Again, when Shanghai Abe confronted him on April 18th and requested payment, Brown asked for still another delay until he could make a trip on the "loop" once more. There is no dispute that Shanghai Abe acquiesced in this request, or that, as a patrolman, he had actual or apparent authority to grant an extension.[6]

---

4. The intermediate report of the Trial Examiner is part of the record before us, and while it does not alter the "substantial evidence" test in respect to the Board's decision, it does indicate that " * * * evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion." Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 496, 71 S.Ct. 456, 469, 95 L.Ed. 456.

5. It is true that a "deck delegate" for the Union told Brown in January, 1955 that he had filled out applications for all members of the crew and forwarded them to union offices in Portland, Oregon. However, this was several months before the effective date of the union security agreement; Brown could not rely on this information in discharging his obligation of becoming a member. The fact that he paid no dues or any other fees until November, 1955 is persuasive that he made no further attempt to perfect his membership until that date.

6. There was some question at the hearing as to the extent of Shanghai Abe's authority, but it is clear that he was clothed with apparent authority as the collector of dues to defer payment of them. See N. L. R. B. v. International Longshoremen's and Warehousemen's Union, Local 10, 9 Cir., 1960, 283 F.2d 558.

At this point the conclusion is inescapable that Brown had been and was a resourceful "free rider" and that any other appraisal of him would be either totally lacking in support or fundamentally contrary to the evidence.

What then, of Shanghai Abe's verbal extension on April 18th and abrupt revocation two days later? The record discloses from Brown's testimony that on April 20th Shanghai Abe demanded payment "before the ship leaves" and although Brown had $60.00 in his pocket, he again asked for time—to call his mother and have her wire the money. In view of Brown's past history of prior evasion, this request appears to be but another in an apparently endless series of "stalls" to avoid his obligation owing under the union security agreement and imposed by the Taft-Hartley Act. In any event, under the circumstances presented here, we think the extent of the Union's obligation, in light of the extension given on April 18th, was merely to not remove Brown from the ship without first making a demand on him for the dues. We do not think that the equities existing in favor of the Union on April 18th suddenly shifted entirely to Brown. When the demand for payment was made on April 20th, he acted at his peril, and his request for additional time was the perilous course to pursue.

The Board's decision attaches no significance to Brown's failure, at any time, to tender the $60.00 in his possession; the reasoning appears to be that such tender appeared useless and that moreover there was no showing that the money was his property or was not otherwise committed. However, the record nowhere indicates the futility of tender; on the contrary, the demand itself indicates a willingness by the Union to accept such payment. Nor does the record contain any evidence to warrant an inference that the money in Brown's possession was not his or that it was not available to pay dues.

The General Counsel also urges in his brief that the demand was a nullity because no particular sum was specified. Any deficiency in the demand itself was obviated by the testimony of Brown himself who testified that he owed $60.00. It is true that when Shanghai Abe visited Brown on April 20th a dispute arose over whether Brown had actually paid the initial $20.00; yet Brown made no effort to inquire as to how much he owed nor any attempt to pay the $60.00 which he claimed that he owed, nor any other amount.

It follows that what occurred after the indulgences were validly withdrawn cannot avail Brown.

We see no substantial difference between this case and the one where an employee, delinquent in dues under a union security agreement, makes a belated tender after the union has requested his discharge but before "actual discharge" by the employer. Although the Board has held that under such circumstances the employee's discharge after a full and unqualified tender is unlawful (Aluminum Workers International Union, 112 N.L.R.B. 619, enf. on other grounds in N. L. R. B. v. Aluminum Workers International Union, 7 Cir., 1956, 230 F.2d 515) this court as well as the Second Circuit have expressly rejected this view declaring that rights once lost cannot be recreated by a belated tender. N. L. R. B. v. Technicolor Motion Pic. Corp., 9 Cir., 1957, 248 F.2d 348; International Ass'n of Machinists A. F. L.-C. I. O. v. N. L. R. B., 2 Cir., 1957, 247 F.2d 414.[7]

Here Brown was delinquent in his dues; when faced with the choice of "pay or get off the ship," he made no tender but instead asked for additional time. As we have already noted, there was no equitable justification for this request nor any right to such further extension. He was required to offer payment immediately; his request for time to call his mother was not such an offer. Thus, any further attempts to tender back dues were untimely

---

7. The Technicolor case was expressly limited to delinquent initiation fees, but the same principles were applied to "periodic dues" by the Second Circuit in the second case cited above.

and squarely within the holding of this court in the Technicolor case.[8]

The facts presented by this record disclose that Brown was by all reasonable standards the very type of "free rider" that Congress sought to foil in sanctioning the union shop. We think that the very best he deserved, under the equities of this case and consonant with the settled policy of the Taft-Hartley Act, was relief from wholly arbitrary action by the Union; short of that, he had no right to enjoy the benefits of union membership without discharging his statutory and contractual duty of becoming a member. We conclude that the union's conduct was not wholly arbitrary and thus did not constitute unlawful discrimination within the meaning of the Act.

■ We have accorded the Board's decision the deference it requires and deserves, yet we are not bound to give it an unwarranted finality:

"Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole * * *. The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both."

Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 490, 71 S.Ct. 456, 95 L.Ed. 456.

This case is thus distinguishable from our holdings in N. L. R. B. v. Eclipse Lumber Co., 9 Cir., 1952, 199 F.2d 684, and N. L. R. B. v. International Assoc. of Mach., 9 Cir., 1953, 203 F.2d 173, where the unions involved demanded payment of certain fines in addition to back dues and initiation fees. There we held that the unions had no right under the Act to cause the discharges for reasons apart from current dues and initiation fees, and that under those circumstances, the failure of the employees to tender the lesser amount of the dues and exclude the inappropriate fines, when the entire amount was insisted upon by the union, would have been a "futile gesture." In the present case there is nothing before us to show that the Union was demanding anything but the "periodic dues" required of Brown, or that the Union was not lawfully entitled to those dues for the entire period beginning with the expiration of the grace period following the execution of the union security agreement.

However, the General Counsel asserts in his brief that the Board "assumed" the Union had a right to secure the discharge of Brown, but did not decide the issue. In its decision, the Board did state that the issue was raised whether the Union could lawfully effect a discharge because included within its demand for payment were back dues for a period prior to Brown's employment with the instant Employer on the Philippine Transport.

There is some authority for the proposition that a union may lawfully demand payment only of those dues owing by an employee during his current employment in order to effect a discharge by his present employer. See, N. L. R. B. v. Murphy's Motor Freight, Inc., 3 Cir., 1956, 231 F.2d 654; N. L. R. B. v. Spector Freight System, Inc., 8 Cir., 1960, 273 F. 2d 272. If this proposition is applicable here, the Union may not have had the

8. This court remanded the Technicolor case for consideration of the question of estoppel; the Board found that the union had accepted the employee's belated payment prior to his discharge and thereby waived its right to effect his discharge, although still adhering to its original broad ruling. See 122 N.L.R.B. 73. The same "waiver" was found by this court in N. L. R. B. v. International Woodworkers of Am., 9 Cir., 1959, 264 F.2d 649. Both cases are distinguishable because in Technicolor the dues, and in Woodworkers the application for membership, were accepted by the respective unions. There was no such acceptance here.

right to effect Brown's discharge for non-payment of those dues which accrued while he was working on the S. S. Mormacrey for a different employer.

This question was not litigated before the Trial Examiner nor argued by any of the parties on this petition; it might require additional evidence to resolve it. We express no opinion as to the applicability of the above cited authorities to the instant case; that must be determined by the Board upon remand, if and when it should decide to take further action. See, N. L. R. B. v. Technicolor Motion Pic. Corp., supra.

The Board, contrary to the Trial Examiner, concluded that the company violated Section 8(a) (3) of the Act by discharging Brown at the Union's request. If the Murphy's Motor Freight and Spector Freight System cases are not applicable then the fault attributed to the Employer by the Board is necessarily negated along with that attributed to the Union. But if those cases are applicable, the question of liability remains and will require further information as to whether the company had reasonable grounds for believing that the demand by the union to dismiss Brown was made for reasons other than delinquency in tendering his dues or initiation fees that were currently due from his present employment.[9]

On December 14, 1959, the employer moved for an order dismissing the petition for enforcement because of an asserted failure of the Board to designate material parts of the record for printing or, in the alternative, for an order directing the clerk to bill the Board for the costs of a printed record including evidence designated by the Employer.

The court filed an order which in part states:

"It appearing to the court that the portions of the record so designated by said respondent may be required for consideration by the court of the issues presented by the petition herein; and that counsel for Pacific Transport Lines, Inc., has stipulated in open court that if the petitioner shall comply with this order and it afterwards appears that some portion of said additional matters designated by said respondent were not reasonably necessary for consideration of the issues herein, then, notwithstanding the rules of this court, the cost of such portions so found to be unnecessary may be charged and taxed to said respondent, which, in that event, promises to pay the same.

"Now Therefore, It Is Ordered that the said portion of the record so designated by said respondent shall be printed and made a part of the printed record herein at the cost and expense of the petitioner under and subject to the conditions stated in this order."

The Board now argues that Rule 17, subd. 6 of the Ninth Circuit Court of Appeals, 28 U.S.C.A., requires that a petitioner only pay for the printing of those parts of the record which the petitioner itself considers material to support its own position. The issue raised by this contention has already been adjudicated against the Board by the foregoing order; and the only question before us at this time is whether those parts of the record attributable to the Employer's designations are "reasonably necessary for consideration of the issues" in the petition for enforcement. We find they are necessary and that the Board should be the bearer of printing costs.

Enforcement of the Order against the respondents is denied and the cause is remanded to the Board for such further proceedings as it deems justified.

---

9. The Company argues that it did not fire Brown but rather he terminated his employment voluntarily as a result of Shanghai Abe's threats; and that therefore, it could not have violated Sec. 8 (a) (3) of the Act. However, both the Trial Examiner and the Board concluded, with the support of evidence which in our opinion was substantial, that Brown was in fact fired by the Company.