307 F.2d 679
 INTERNATIONAL UNION OF ELECTRICAL, RADIO AND MACHINE WORKERS, AFL-CIO, FRIGIDAIRE LOCAL 801, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
GENERAL MOTORS CORPORATION, FRIGIDAIRE DIVISION, Respondent.
 No. 16273.
 No. 16301.
 United States Court of Appeals District of Columbia Circuit.
 Argued January 4, 1962.
 Decided June 7, 1962.
 Petition for Rehearing Denied in No. 16,273 July 5, 1962.
 Certiorari Denied December 10, 1962.
 
 See 83 S.Ct. 307.
 Mr. David S. Davidson, Washington, D. C., with whom Mr. Benjamin C. Sigal, Washington, D. C., was on the brief, for petitioner in No. 16273.
 Mr. Hans J. Lehmann, Attorney, National Labor Relations Board, with whom Messrs. Stuart Rothman, General Counsel, National Labor Relations Board, Dominick L. Manoli, Associate General Counsel, National Labor Relations Board, Marcel Mallet-Prevost, Assistant General Counsel, National Labor Relations Board, and Allison W. Brown, Jr., Attorney, National Labor Relations Board, were on the brief, for respondent in No. 16273 and petitioner in No. 16301.
 Mr. K. Douglas Mann, Detroit, Mich., with whom Mr. George L. Derr, Detroit, Mich., was on the brief, for respondent in No. 16301.
 Before EDGERTON, BAZELON and BURGER, Circuit Judges.
 BURGER, Circuit Judge.
 
 
 1
 Case No. 16273 comes to us on the petition of the International Union of Electrical, Radio, and Machine Workers, AFL-CIO, Frigidaire Local 801, (Union) to review a National Labor Relations Board order of January 1961. The Board cross-petitions for enforcement of that order against the Union. Case No. 16301 is brought here by the Board petitioning for enforcement of the same order against General Motors Corporation, Frigidaire Division, (Company) also a party to the proceeding below.[1] Jurisdiction of this court rests on Sections 10 (e) and 10(f) of the National Labor Relations Act, as amended 61 Stat. 135, 73 Stat. 519, 29 U.S.C.A. § 151 et seq., hereafter called the Labor Act. The Board found that the Union violated Sections 8(b) (1) (A) and (2) of the Labor Act by refusing a valid tender of dues and thereafter causing Snyder's discharge for failure to join the Union. The Board also found the Company violated Section 8(a) (3) and (1) of the Labor Act by discriminatorily discharging Snyder at the demand of the Union when the Company had reasonable grounds to believe Snyder's membership had been denied for reasons other than failure to tender fees and dues. The challenged order (1) requires the Union to notify one Donald L. Snyder and the Company that the Union withdraws its objections to Snyder's employment, and directs the Union to request the Company to offer Snyder reinstatement, and (2) requires the Company to offer Snyder immediate and full reinstatement.
 
 
 2
 Donald Snyder had been employed by General Motors at its Dayton, Ohio plant for 30 years prior to April 6, 1959 when at Union insistence the Company discharged him. The facts leading up to discharge upon which the Board relied are significant. From August, 1955 to June, 1958, under the terms of a valid Union security agreement, Snyder had been a Union member. Effective shortly after the expiration of the Union agreement with the Company on May 31, 1958, Snyder terminated his membership. No one challenges his right to terminate Union membership during a period when no collective bargaining agreement was in force. Thereafter, following a walkout by the Union, a new agreement was negotiated by the Union and the Company on October 6, 1958, to become effective October 21, 1958. By its terms any employee who was not a Union member on the effective date would be required, on pain of discharge, to become a member within 90 days thereafter, that is, by January 19, 1959, by payment of a five dollar initiation fee and membership dues for the month of January or a total of $8.00. Snyder did not pay the requisite amounts nor did he join the Union by January 19th. Approximately a month later, on February 23, 1959, when Snyder still had not joined the Union, the Union Financial Secretary, Arch Little, informally notified James Rife of the Company's Labor Relations Department that Snyder was in serious trouble and that a Union request for his discharge could be expected.
 
 
 3
 Until this period in late February, the record does not indicate, except perhaps by inference which the Board in its discretion was free to draw or not, that Snyder was apprised by anyone, Union or Company, of his obligations under the new agreement. Snyder further denied that he ever saw a copy of the 1958 agreement before April 3, 1959. And there is no evidence to demonstrate that Snyder learned of the new agreement or of its contents through the newspaper, television or radio announcements noting the strike settlement in October 1958, nor through the various leaflets which were handed out to employees by the Union thereafter.
 
 
 4
 Accordingly the Board found that Snyder's first awareness of the necessity of Union membership if he was to keep his job came on February 26, 1959 when he approached the Company foreman Ferguson to inquire if such were the case. Upon learning that it was, Snyder replied that he would get a money order and send his dues in to the Union. On the following day Snyder mailed to the Union a money order for $15.00.
 
 
 5
 By coincidence the Union executive board also met on February 26 and voted to request Snyder's discharge for failure to apply for membership and to pay the required initiation fees. The following morning, Union President Shump informally indicated to Company representatives that the executive board had agreed the night before to ask for Snyder's discharge, and that the Company could anticipate receiving a formal written request by the Union for Snyder's dismissal. Snyder's $15 money order which was sent on the 27th was accompanied by a letter stating that the amount was for dues in full for October, November and December of 1958, and January and February of 1959. Snyder testified without contradiction that he had not thought of the initiation fee and had not been informed of it. It is to be observed that as of this date Snyder only owed $11, $5 for initiation fee and $6 for two months' dues (January and February), so he was actually overpaying the Union by $4 when he tendered $15 apparently on the theory that he could accomplish reinstatement by paying dues back to the date of the new Union contract whose terms the Superintendent had described to him on the 26th. The Union received the money order on February 28, and at President Shump's direction it was sent back to Snyder without any explanation on March 3. On March 3 the Union formally demanded that the Company discharge Snyder pursuant to the Union security agreement. The Company received this request on March 4. Union President Shump testified that one reason the money order was returned to Snyder was because he did not "spell out" that $5 of the sum was for the initiation fee.
 
 
 6
 Snyder meanwhile inquired of a Company Labor Department staff member why the $15 had been returned and was told on March 5 that it was because he was not a Union member. Snyder thereupon obtained a membership application and an authorization card for the checkoff of dues, both of which he filled in and returned to the Labor Department staff man, along with the original $15 money order dated February 27.
 
 
 7
 Later in March Snyder mailed in an additional three dollars dues for that month, which the Union returned to him on April 1, again without explanation. In the meantime, Snyder remained on Company payrolls, a circumstance which on April 1st moved the Union to file a grievance with the Company requesting that the Company fulfill its obligation to discharge Snyder. In meetings between Union and Company representatives on April 1 and 2, although a Company representative showed the Union the membership application and dues check-off authorization signed by Snyder, the Union stated it was "too late" for Snyder to obtain membership, and refused to meet with him to discuss the matter. On April 6, 1959, thus confronted with the Union's unrelenting attitude, the Company ended Snyder's thirty year tenure by discharging him, thereby simultaneously cutting off all his pension rights accumulated over a lifetime of service with General Motors.
 
 
 8
 The general scheme of the Labor Act makes it illegal to require union membership as a condition of employment or to discharge an employee for non-membership. Congress permitted an exception where the collective bargaining contract makes union membership a condition of employment. But that exception was carefully narrowed by the terms of the statute. Even under a valid union security contract a union cannot lawfully demand the discharge of an employee if membership
 
 
 9
 "has been denied * * * on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required"
 
 
 10
 of members. Sec. 8(b) (2), 29 U.S.C.A. § 158(b) (2). And the employer is forbidden to effect a discharge unless he has no reasonable ground for believing that the employee's membership was denied for reasons other than his failure to make a tender. Sec. 8(a) (3), 29 U.S. C.A. § 158(a) (3).
 
 
 11
 "Congress intended to prevent utilization of union security agreements for any purpose other than to compel payment of union dues and fees." Radio Officers' Union v. NL RB, 347 U.S. 17, 41, 74 S.Ct. 323, 98 L.Ed. 455 (1954).
 
 
 12
 See also Puerto Rico Drydock & Marine Terminals v. NLRB, 109 U.S.App.D.C. 78, 284 F.2d 212, cert. denied, 364 U.S. 883, 81 S.Ct. 172, 5 L.Ed.2d 104 (1960).
 
 
 13
 The Union urges that we must overturn the Board's order (1) because Snyder failed to make timely tender of dues and initiation fee by January 19, 1959, the last day of the 90 day period, or (2) in the alternative, because Snyder's tender, even if timely, was ineffective since it failed to allocate a part of the sum tendered specifically to the payment of an initiation fee. Neither of these contentions can be sustained.
 
 
 14
 We hold the Union may not refuse a good faith tender of dues made within a reasonable time after the employee has learned or reasonably should have learned that he must join the Union in order to keep his job.[2] Cf. NLRB v. Aluminum Workers, 230 F.2d 515, 520 (7th Cir. 1956). Snyder was not forever barred from Union membership when he failed by January 19th to offer an application for membership along with the necessary monies, inasmuch as the record supports a view that he was not apprised of the necessity of membership before February 26. His technically belated tender, on February 27, 1959, of more than the necessary sums for membership, was received by the Union within a reasonable time after he was informed of this necessity. The Union's rejection of this tender was therefore improper, unless the tender itself was improperly made.[3] We hold it was properly made.
 
 
 15
 Among the most important of labor standards imposed by the Act as amended is that of fair dealing, which is demanded of unions in their dealings with employees. See NLRB v. International Woodworkers, 264 F.2d 649, 657 (9th Cir.), cert. denied, 361 U.S. 816, 80 S.Ct. 56, 4 L.Ed.2d 63 (1959). The requirement of fair dealing between a union and its members is in a sense fiduciary in nature and arises out of two factors. One is the degree of dependence of the individual employee on the union organization; the other, a corollary of the first, is the comprehensive power vested in the union with respect to the individual. See NLRB v. International Woodworkers, supra. The requirement of fair dealing is not limited to union members; when an individual becomes an employee of a company having a union security clause in its contract the new employee is not free to join or refuse to join a union, nor does he have a voice in the selection of his bargaining representative. He takes the existing union and its contract in effect as one of the conditions of his employment. From the beginning of his employment, the union which can require his membership or command his discharge is therefore charged with an obligation of fair dealing which includes the duty to inform the employee of his rights and obligations so that the employee may take all necessary steps to protect his job.
 
 
 16
 A union may not treat as adversaries either its members or those potential members whose continued employment is dependent upon union membership. The Union's failure to inform Snyder of what he needed to do to protect his rights made it impossible for him to make a proper tender sooner than he did. The Union is bound by law to represent all employees in the bargaining unit. The Union is the agent for employees and as such "is subject to a duty to use reasonable efforts to give his principal information which is relevant to affairs entrusted to him and which, as the agent has notice, the principal would desire to have * * *." Restatement (Second), Agency § 381 (1958). The Union's assertion of improper tender, based on Snyder's failure specifically to allocate the $15 to dues and the initiation fee respectively, must be viewed by the Board and the court in the context provided by the statutory concept of fair play. We think a minimum of fair treatment would have included at least some notice to Snyder that his tender was excessive and that he should have indicated the manner in which he wished the money applied. Out-of-hand rejection of the money order, without a word of explanation, amounts in our view to an arbitrary failure on the Union's part to meet its obligations and peculiar responsibilities under the Act. As we agree that Snyder made the tender in good faith, the Board was clearly correct in asserting that the Union "was under an obligation to explain the mechanics of reinstatement to Snyder and give him the opportunity to direct allocation of his tender in the manner required by the Union's rules for reinstatement." See NL RB v. International Woodworkers, supra 264 F.2d at 657.
 
 
 17
 "Under the standard of fair treatment, which both the Wagner and the Taft-Hartley Acts invoke, the least that the Union officials could have done would have been to advise Hatfield that no former application had been found, and give him an opportunity then to make, or refuse to make, an application for membership." Ibid.
 
 
 18
 "The bargaining representative, whoever it may be, is responsible to, and owes complete loyalty to, the interests of all whom it represents." Ford Motor Co. v. Huffman, 345 U. S. 330, 338, 73 S.Ct. 681, 97 L.Ed. 1048 (1953).
 
 
 19
 These considerations add support to the Board's further finding that the Union's request for Snyder's discharge was not truly predicated on his failure to pay necessary dues and fees.
 
 
 20
 The Union vigorously attacks the Board's failure to make affirmative findings as to the facts which led to the demand for discharge. The record shows a history of mutual hostility between Snyder and the Union growing out of a history of tardiness in payment of dues, refusal to sign a dues check-off authorization under the prior Union contract, termination of membership during the "no-contract" interval and apparent support of then pending Michigan enactment of a so-called "right-to-work" law. But it was not necessary for the Board to make any assessment of responsibility for this mutual hostility since the Board was not required to make an affirmative determination that all or any of these factors comprised the actual basis or motivation for the Union's demand for Snyder's discharge. No affirmative finding as to the cause of discharge is needed. Under the language of the statute the Union commits an unfair labor practice when it causes an employer to discriminate against an employee "on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required * * *." 61 Stat. 136 (1947), 29 U.S.C.A. § 158(b) (2). (Emphasis added.)
 
 
 21
 Similarly, as all the relevant facts of Snyder's tender and the Union's unexplained rejection were known to the Company, and as it had notice on February 26 and March 5 of Snyder's unawareness of the necessity of Union membership, it had reasonable grounds for recognizing and should have recognized that the Union's request was not based on the only grounds Congress permits for a discharge demand, and its decision to yield to the Union's will was thus properly viewed by the Board as knowing discrimination and a violation of § 8(a) (3) and (1) of the Act.
 
 
 22
 The petition to set aside the Board's order in No. 16273 will be denied. The Board's cross-petition for enforcement of its order against the Union in No. 16273 will be granted, as will its petition for enforcement of the order against the Company in No. 16301.
 
 
 23
 Petition in No. 16273 denied.
 
 
 24
 Cross-petition in No. 16273 granted.
 
 
 25
 Petition for enforcement in No. 16301 granted.
 
 
 
 Notes:
 
 
 [1]
 The Board's Decision and Order are reported at 129 NLRB No. 169 and 130 NLRB No. 132
 
 
 [2]
 Assuming,arguendo, that the Board erroneously based its correct conclusion as to discrimination on another ground, we are free to affirm the Board without offending S. E. C. v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943), on this alternative "ground within the power of the appellate court to formulate." William Chae-Sik Lee v. Kennedy, 111 U.S.App.D.C. 35, 294 F.2d 231, 234, cert. denied, 368 U.S. 926, 82 S.Ct. 362, 7 L.Ed.2d 190 (1961).
 
 
 [3]
 The record supports the Board's finding that the Union did not make a definite demand for Snyder's discharge under the contract until March 3, 1959. By that time the Union had received a tender in excess of the amount Snyder owed and had rejected the payment. The cases cited by the Union do not apply to these facts for they deal with situations where the Union demand preceded any payment or tender